IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

RICHARD HELMS,

        Plaintiff,

vs.

UNITED STATES OF AMERICA,

        Defendant.

Case No. 3:11-cv-00186-SLG

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Before the Court at Docket 49 is Defendant United States' Motion for Summary Judgment and to Dismiss Plaintiff's Action for Lack of Jurisdiction pursuant to Federal Rules of Civil Procedure 12(b)(1) and 56. At Docket 56, Plaintiff Richard Helms opposed the motion. At Docket 59, the United States replied. At Docket 62, Mr. Helms submitted supplemental materials. On May 15, 2014, the Court heard oral argument on the motion.[1] At oral argument, the United States reserved its right to object to the supplemental materials filed by Mr. Helms.

Also before the Court at Docket 64 is Mr. Helms's Motion for Leave to Supplement Oral Argument. The United States opposed the motion, and Mr. Helms replied.[2]

Having considered the documents filed with the Court, the law, and the arguments of the parties, the Court will grant the motion to supplement and will grant the motion for summary judgment.

---

[1] Docket 63 (Minutes).

[2] Docket 68 (Opp'n Supp.); Docket 70 (Reply Supp.).

# FACTUAL AND PROCEDURAL BACKGROUND[3]

## I. Mr. Helms suffers a stroke in Nome, Alaska and files suit against the doctor and hospital.

On August 29, 2008, in Nome, Alaska, Mr. Helms suffered an ischemic stroke. Beginning around 5:45 a.m., he experienced symptoms including headache, vision loss, pain in his eye and face, and dizziness.[4] Mr. Helms sought treatment at the Norton Sound Regional Hospital ("NSRH"). By 6:25 a.m., Mr. Helms was seen by a nurse.[5] He was then seen by Bradley Logan, M.D.[6] Mr. Helms informed Dr. Logan of his symptoms as described above, and also informed Dr. Logan that he was nauseous.[7] Dr. Logan's notes state that Mr. Helms was experiencing an "[a]typical headache, likely due to diabetes, stress, GI disturbance."[8] Dr. Logan discharged Mr. Helms with instructions to go home and sleep, and return if his eye pain continued.[9] Dr. Logan's notes do not indicate that Mr. Helms may have had a stroke, although Dr. Logan

---

[3] The facts are presented in the light most favorable to Plaintiff for purposes of this motion for summary judgment. See Summary Judgment Standard at p. 6.

[4] Docket 50-1 at 7, 68:12-23 (11/5/13 Dep. of Richard J. Helms, herein Helms Dep.).

[5] Docket 50-1 at 15, 76:4-8, 76:22-24 (Helms Dep.).

[6] Docket 50-1 at 15, 76:4-8, 76:22-24 (Helms Dep.).

[7] Docket 50-1 at 17, 81:6-12 (Helms Dep.).

[8] Docket 50-2 (8/29/08 NSRH Treatment Record).

[9] Docket 50-1 at 19-21, 94:20-96:7 (Helms Dep.).

testified that he "thought it was possible that [Mr. Helms] had had a stroke. And a stroke is, by definition, a progressive event."[10]

Later in the day on August 29, Mr. Helms traveled by plane to Anchorage.[11] The next evening, on August 30, Mr. Helms went to Providence Hospital Medical Center for further treatment.[12] Mr. Helms was triaged at Providence at approximately 9:28 p.m.[13] Doctors at Providence diagnosed an ischemic stroke.[14] At that time, Mr. Helms learned that he could not receive tissue plasminogen activator ("tPA") treatment—a treatment that offers the possibility of stroke symptom reversal—because, as will be discussed in more detail below, tPA treatment must be administered within a short window after the stroke event.[15]

Mr. Helms filed a Complaint against Dr. Logan and Norton South Health Corporation in Alaska Superior Court in August 2010 alleging that Dr. Logan and the hospital were negligent because Dr. Logan failed to diagnose and appropriately treat Mr. Helms's stroke.[16] Mr. Helms asserts that the "misdiagnosis and failure to document and medevac [Mr. Helms to a hospital for a higher level of care] is the injury, which was

---

[10] Docket 58-2 at 20, 45:5-10 (3/17/14 Dep. of Bradley Logan, M.D., herein Logan Dep.); see also Docket 58-2 at 3-9, 28:21-34:18.

[11] Docket 50-1 at 25, 100:12-24 (Helms Dep.).

[12] Docket 50-1 at 31, 108:5-25 (Helms Dep.).

[13] Docket 50-1 at 31, 108:5-25 (Helms Dep.).

[14] See Docket 56-1 at 2-3 (8/8/13 Report of Bruce Wapen, M.D., herein Wapen Report).

[15] Docket 50-1 at 35-36, 121:22-122:21 (Helms Dep.).

[16] Docket 1-1 (Compl.).

proximately caused by Dr. Logan's conduct."[17] As a result of the stroke, Mr. Helms continues to suffer from vision loss, as well as "stress and strain and severe headaches."[18]

In September 2011, the United States removed the litigation to federal court pursuant to the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 450 *et seq.* and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, which gives this Court jurisdiction.[19] Thereafter, the United States' motion to substitute itself as the defendant was granted.[20]

## II. Evidence concerning treatment for a stroke and the treatment available in Nome.

In 2008, the treatment for a stroke would have been a diagnostic CT or MRI scan, followed by a discussion with the patient of the pros and cons of the use of the drug tPA, followed by the administration of the drug if the patient so chose.[21] At that time, the standard of care was to offer the patient tPA only if it could be administered within three hours of the onset of symptoms.[22]

---

[17] Docket 56 at 8 (Opp'n).

[18] Docket 64-1 at 1 (Proposed Supp.); 5/15/14 Oral Argument; *see also* Docket 50-1 at 39, 156:8-19 (Helms Dep.).

[19] Docket 1 (Notice of Removal). The case had been earlier been removed and then remanded. *See Helms v. Logan and Norton South Health Corp.*, 3:11-cv-00062-TMB (filed Apr. 1, 2011, remanded Aug. 8, 2011).

[20] Docket 5 (Mot. to Substitute); Docket 7 (Order).

[21] Docket 56-1 at 3-4 (Wapen Report).

[22] Docket 50-3 at 4, 62:17-63:11 (Wapen Dep.).

In August 2008, NSRH did not have a CT scanner or MRI for diagnostic purposes.[23] Dr. Logan testified that on occasion NSRH would medevac patients to hospitals in Anchorage or Fairbanks, but that NSRH had a policy not to medevac patients from Nome to Bethel.[24] The parties seem to disagree concerning the length of time it takes to medevac a patient from Nome to Anchorage or Fairbanks.[25]

Mr. Helms's medical expert, Bruce Wapen, M.D., has provided an expert report and deposition testimony.[26] Dr. Wapen opined that Mr. Helms had known risk factors for stroke when he presented at the emergency room at NSRH. The standard of emergency medicine care would have required Mr. Helms to have had a thorough physical examination with specific attention given to the eyes and neurologic systems.[27] Dr. Wapen opined that Dr. Logan failed to conduct a good examination, and thereby failed to tentatively diagnose the stroke in progress, and then failed to arrange to transfer Mr. Helms to a facility with a higher level of care where the stroke could have been diagnosed and treated.[28] Dr. Wapen also testified concerning the pros and cons

---

[23] Docket 58-1 at 15, 19:22-24 (Logan Dep.).

[24] Docket 58-2 at 8, 33:3-17 (Logan Dep.).

[25] Dr. Logan testified that a transfer from NSRH to a hospital in Anchorage or Fairbanks would require at least two hours and forty minutes of air time. Docket 58-2 at 12-15, 37:16-40:9 (Logan Dep.). Helms asserts, without providing factual support, that the hospital in Bethel was an available option, and that it was closer than Anchorage, which Helms asserts is a one hour and twenty minute commercial flight. Docket 56 at 2-3 (Opp'n). These disputed facts are not determinative of this motion.

[26] Docket 56-1 (Wapen Report); Docket 50-3 (11/19/13 Dep. of Bruce Wapen, herein Wapen Dep.).

[27] Docket 56-1 at 3 (Wapen Report).

[28] Docket 56-1 at 5 (Wapen Report).

of tPA treatment. Some patients' symptoms will improve or resolve without tPA treatment.[29] He explained that tPA improves or completely resolves the symptoms of about 12% of stroke patients.[30] But Dr. Wapen also testified that 6% of people that have tPA treatment experience intracranial bleeding, which can be catastrophic or deadly.[31] Dr. Wapen opined that "[e]ven under the best of circumstances, using tPA offers only the possibility of stroke symptom reversal, not the probability."[32] And he testified that a doctor cannot predict ahead of time on a more-likely-than-not basis which patients will improve with the administration of tPA treatment.[33] Specifically as to Mr. Helms, Dr. Wapen agreed with the United States' counsel that if tPA "could have been administered within three hours, [it] might possibly have improved his outcome" or "it might also have caused him to suffer cerebral hemorrhage."[34]

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The burden of showing the absence

---

[29] Docket 50-3 at 3, 42:4-16 (Wapen Dep.).

[30] Docket 50-3 at 3, 41:23-42:16 (Wapen Dep.).

[31] Docket 50-3 at 3, 42:19-43:6 (Wapen Dep.).

[32] Docket 56-1 at 5 (Wapen Report).

[33] Docket 50-3 at 5, 66:6-9 (Wapen Dep.).

[34] Docket 50-3 at 6, 70:2-10 (Wapen Dep.).

of a genuine dispute of material fact initially lies with the moving party.[35] If the moving party meets this burden, the non-moving party must present specific evidence demonstrating the existence of a genuine issue of fact.[36] The non-moving party may not rely on mere allegations or denials.[37] It must demonstrate that enough evidence supports the alleged factual dispute to require a finder of fact to make a determination at trial between the parties' differing versions of the truth.[38]

When considering a motion for summary judgment, a court must accept as true all evidence presented by the non-moving party and draw "all justifiable inferences" in the non-moving party's favor.[39] To reach the level of a genuine dispute, the evidence must be such "that a reasonable jury could return a verdict for the non-moving party."[40] The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."[41] If the evidence provided by the non-moving party is "merely colorable" or "not significantly probative," summary judgment is appropriate.[42]

---

[35] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

[36] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Oracle*, 627 F.3d at 387.

[37] *Anderson*, 477 U.S. at 248-49.

[38] *Id.* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)).

[39] *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

[40] *Id.* at 248.

[41] *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

[42] *Anderson*, 477 U.S. at 249-50 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank*, 391 U.S. at 290).

## DISCUSSION

### I. Under the Federal Tort Claims Act, Mr. Helms must demonstrate that the United States is liable under Alaska law.

The United States as a sovereign "may not be sued without its consent."[43] Under the FTCA, the United States has waived its sovereign immunity from lawsuits in limited circumstances. For tort claims where the United States has waived immunity, it is liable for compensatory money damages in the same manner and to the same extent as a private individual, as determined "in accordance with the law of the place where the act or omission occurred."[44]

Dr. Logan was a federal employee at NSRH and pursuant to 108 Stat. 2499, 2530, "individuals providing health care services pursuant to [the type of contract that covered Dr. Logan] are covered by the [FTCA]."[45] Here, the events underlying Mr. Helms's allegations of medical malpractice occurred in Nome, Alaska and at NSRH. Accordingly, Alaska law applies to this FTCA action.

### II. Mr. Helms cannot satisfy the requirements of Alaska's medical malpractice statute, AS 09.55.540.

Alaska's medical malpractice statute, AS 09.55.540, provides:

(a) In a malpractice action based on the negligence or wilful misconduct of a health care provider, the plaintiff has the burden of proving by a preponderance of the evidence

---

[43] *Jachetta v. United States*, 653 F.3d 898, 903 (9th Cir. 2011) (quoting *United States v. Mitchell*, 463 U.S. 206, 212 (1983)).

[44] 28 U.S.C. §§ 2672, 2674; *see also Yako v. United States*, 891 F2d. 738 (9th Cir. 1989).

[45] *See* Docket 1 (Notice of Removal) (citing Dep't of the Interior & Related Agencies Appropriations, Pub. L. No. 103-332, 108 Stat. 2499, 2530 (1994)).

> (1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing;
>
> (2) that the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and
>
> (3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
>
> (b) In malpractice actions there is no presumption of negligence on the part of the defendant.

The United States denies that Dr. Logan was negligent and denies that Mr. Helms could have been transported from Nome to a hospital in Anchorage or Fairbanks within the tPA treatment window.[46] But the United States' primary argument in its motion for summary judgment is that even if Mr. Helms could have been transported within the tPA treatment window, "the testimony of Plaintiff's expert (Dr. Bruce Wapen) establishes that Plaintiff cannot prove all of the required elements for a medical malpractice claim under . . . AS 09.55.540."[47] The United States asserts that AS 09.55.540 requires proof by a preponderance of the evidence and does not allow a medical malpractice claim based on a lesser burden of proof, such as a claim based on a "loss of chance" of recovery theory.[48]

---

[46] Docket 50 at 2 (Mot.).

[47] Docket 50 at 2 (Mot.).

[48] Docket 50 at 4 (citing *Crosby v. United States*, 48 F.Supp.2d 924, 926-32 (D. Alaska 1999)). The "'loss of chance' doctrine in medical malpractice actions permits plaintiffs to recover damages for the reduction in the odds of recovery attributable to a defendant, even if the failure to recover cannot be shown to have been proximately caused by the defendant's negligence." *Crosby*, 48 F.Supp.2d at 926.

Mr. Helms responds that Dr. Logan violated the standard of care for emergency room doctors by failing to diagnose a stroke in progress, and by failing to immediately transfer Mr. Helms to a hospital with a higher level of care, which together resulted in the inability to offer Mr. Helms tPA treatment.[49] Mr. Helms acknowledges that AS 09.55.540 governs the burden of proof for malpractice claims in Alaska, but asserts that the Alaska legislature did not intend, through enactment of AS 09.55.540, to reject the loss of chance theory.[50] Mr. Helms's opposition implies that the Court should apply the Restatement (Second) of Torts § 323, which would support a "loss of chance" of recovery cause of action.[51]

The unambiguous terms of AS 09.55.540 provide that in a medical malpractice action, "the plaintiff has the burden of proving by a preponderance of the evidence . . . that as a proximate result of [the defendant's] lack of knowledge or skill or the failure to

---

[49] Docket 56 at 5 (Opp'n).

[50] 5/15/14 Oral Argument.

[51] Docket 56 at 6 (Opp'n) (quoting Restatement (Second) of Torts § 323 (1965) ("One who undertakes . . . to render services to another which he should recognize as necessary for the protection of the other's person . . . is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm.")). The Restatement (Third) Torts: Liability for Physical and Emotional Harm § 26 (2010) acknowledges that "a number of courts have recognized a lost opportunity (or lost chance) for cure of a medical condition as a legally cognizable harm," but also provides that courts adopting this theory should not rely specifically on Restatement (Second) Torts § 323; *see also Mohr v. Grantham*, 172 Wash.2d 844, 853, 262 P.3d 490, 494 n. 5 (Wash. 2011) (noting Restatement (Third) Torts § 26 analysis that "reliance by many courts on § 323 of the Restatement (Second) as support for the doctrine [of lost chance of a better outcome] is misplaced"); *Crosby*, 48 F.Supp.2d at 926-27, 930-31 (describing Restatement § 323 as one of three categories of "loss of chance" theory, but concluding that any of the three categories would be inconsistent with AS 09.55.540).

exercise this degree of care [ordinarily exercised under the circumstances,] the plaintiff suffered injuries that would not otherwise have been incurred."

Here, even if Mr. Helms could demonstrate by a preponderance of the evidence that Dr. Logan lacked the degree of knowledge or skill of an emergency care doctor (as required by AS 09.55.540(a)(1) and (2)), he cannot show by a preponderance of the evidence this alleged negligence caused Mr. Helms to suffer the reduced vision or other injuries, such that they "would not otherwise have been incurred" absent the doctor's negligence.[52] Rather, Mr. Helms's expert, Dr. Wapen, opined that "tPA offers only the possibility of stroke symptom reversal, not the probability," and testified that only 12% of patients treated with tPA have a better outcome than patients who do not receive tPA treatment.[53] And he testified that 6% of patients who receive tPA respond negatively.[54] Mr. Helms acknowledges that "*[g]eneral statistics show* that even under the best of circumstances, using tPA offers only the possibility of stroke symptom reversal, not the probability."[55] Mr. Helms asserts that tPA was the only possible treatment for Mr. Helms's stroke in 2008. Nonetheless, with the evidence before the Court—specifically, the tPA success and risk statistics—Mr. Helms cannot demonstrate that his medical

---

[52] AS 09.55.540(a)(3).

[53] Docket 56-1 at 5 (Wapen Report); Docket 50-3 at 3, 41:23-42:16 (Wapen Dep.).

[54] Docket 50-3 at 3, 42:19-43:6 (Wapen Dep.).

[55] Docket 56 at 7 (Opp'n) (emphasis in original).

injuries would not "otherwise have been incurred"[56] had he been able to elect to have tPA treatment.

The United States cites two cases, *Poulin v. Zartman* and *Crosby v. United States*, which further support this Court's decision. In *Poulin*, the plaintiff brought a medical malpractice claim on behalf of an infant who suffered permanent physical and mental disabilities as a result of treatment at the time of birth. A jury rendered a verdict in favor of the doctor. On appeal, the plaintiff challenged various jury instructions relating to AS 09.55.540. At trial, the plaintiff had requested an instruction "that doctors with 'superior knowledge' or certified by a National Board be held to a higher standard than the 'similar communities' test set out by the statute."[57] The Alaska Supreme Court affirmed the trial court's rejection of that instruction. The court explained that "[t]he language of AS 09.55.540 is so clear and unambiguous that we are foreclosed from broadening the standard contained therein through judicial construction."[58] The *Poulin* court did not analyze the causation or injury requirements under AS 09.55.540(a)(3).

In *Crosby*, this Court directly addressed causation under AS 09.55.540(a)(3), evaluating the "loss of chance" theory.[59] The Court relied on *Poulin* to conclude that

---

[56] AS 09.55.540(a)(3).

[57] *Poulin v. Zartman*, 542 P.2d 251, 268 (Alaska 1975).

[58] *Id.* at 270. The *Poulin* court reversed and remanded on another instruction concerning whether the doctor was negligent in his failure to adequately supervise his nurses.

[59] *Crosby*, 48 F.Supp.2d at 931.

"adoption of a 'loss of chance' theory would contravene the clear and unambiguous language of AS 09.55.540."[60]

Mr. Helms attempts to distinguish *Poulin* and *Crosby*.[61] But the statutory analysis and policy discussions in *Poulin* and *Crosby* are instructive to this Court. In short, this Court is unaware of any Alaska authority that would allow the Court to alter the statutorily-mandated burden of proof or the causation requirement set forth in AS 09.55.540.

Mr. Helms also cites *Mohr v. Grantham*, a decision from the Supreme Court of Washington.[62] But *Mohr* is not instructive because it applies Washington law and concludes that "Washington recognizes loss of chance as a compensable interest."[63] *Mohr* analyzed a Washington malpractice statute that was drafted quite differently from AS 09.55.540.[64] Even if the Court found the *Mohr* analysis compelling, the difference

---

[60] *Id.*

[61] Docket 56 at 6-7 (Opp'n).

[62] Docket 56 at 8-9 (Opp'n) (discussing *Mohr v. Grantham*, 172 Wash.2d 844, 262 P.3d 490 (Wash. 2011)).

[63] *Mohr*, 172 Wash.2d at 853, 262 P.3d at 494. The *Mohr* dissent discusses and agrees with the conclusion of *Crosby*. The dissent explains that "[t]he lost chance doctrine contravenes the long-standing rule that a verdict in a medical malpractice action must not rest on conjecture and speculation . . . . A possibility is not enough" to demonstrate causation for purposes of a medical malpractice claim. *Id.* at 865 (Madsen, J., dissenting).

[64] *Id.* at 856, 262 P.3d at 496 (discussing RWC 7.70.040). The Washington statute requires that a plaintiff prove that there was a failure to exercise the degree of care, skill, and learning expected of a similarly situated health care provider, and "[s]uch failure was a proximate cause of the injury complained of." Unlike AS 09.55.540, the Washington statute does not require that the plaintiff demonstrate by a preponderance of the evidence that the "proximate result of this lack of knowledge or skill or the failure to exercise this degree of care [was that] the plaintiff suffered injuries that would not otherwise have been incurred." AS 09.55.540.

between the Washington and Alaska statutes makes *Mohr* clearly distinguishable. For it is Alaska's statutory language that is controlling in this action.

Mr. Helms also provided supplemental materials, summarizing the results in cases where plaintiffs were not provided tPA in California, Florida, Kentucky, and Connecticut.[65] But these cases are not instructive to this Court as they, too, do not address the statutory language in AS 09.55.540.

Mr. Helms asserts that to interpret AS 09.55.540 to preclude a loss of chance theory of recovery means that "all physicians working in areas of Alaska where there is no medical imag[ing] equipment, but the ability to promptly medevac can just write-off a patient because tPA outcomes do not rise to a certain statistical percentage of certainty."[66] If Alaskan health care providers make treatment decisions based solely on malpractice exposure, then the statute could have this result. But, fundamentally, it is the legislature that is entitled to make determinations concerning the appropriate standard of care and burdens of proof for medical malpractice actions.[67]

### III. Mr. Helms's objections to the United States' medical experts.

Mr. Helms objects to any reliance by the Court on the reports of the United States' medical experts, Drs. Rubenstein and Goldman. Mr. Helms asserts that these doctors do not satisfy the statutory requirements of AS 09.20.185 to opine as

---

[65] Docket 62 (Notice of Supplemental Materials).

[66] Docket 56 at 9 (Opp'n).

[67] *See Poulin*, 542 P.2d at 270.

emergency room physicians.[68] The United States responds that it does not rely on the testimony of these doctors in its motion, explaining that it cites Dr. Rubenstein's report only for facts with which Dr. Wapen agreed (i.e., the effectiveness of tPA treatment).[69] The Court has not relied on either of the United States' experts in determining this motion.

## IV. Mr. Helms's Motion for Leave to Supplement Oral Argument.

At Docket 64, Mr. Helms filed a Motion for Leave to Supplement Oral Argument. In the supplement, Mr. Helms identifies additional physical injuries he suffered as a result of the alleged negligence. Mr. Helms also argues that the drug tPA "may not have yielded a high statistically curative effect of 100% reversal but could in fact remediate . . . injury or prevent another."[70] The United States opposed the motion to supplement because the additional injuries would be subject to the same causation requirements as discussed in the summary judgment briefing; because Mr. Helms suggests that he would to introduce evidence from unidentified doctors at trial; and because Mr. Helms seems to make a new "'curative effect' of tPA" argument, which is "a lawyer's argument, not admissible evidence."[71]

---

[68] Docket 56 at 9-10 (Opp'n).

[69] Docket 59 at 8-10 (Reply).

[70] Docket 64-1 (Proposed Supp.).

[71] Docket 68 at 2 (Opp'n Supp.).

Under Alaska law, the time to present an expert opinion in a medical malpractice case is at the summary judgment stage.[72] An assertion that additional medical evidence may be presented at trial is insufficient to survive summary judgment. Mr. Helms's supplemental brief also suggests that tPA might be more effective than the evidence in the record otherwise demonstrates. But this legal argument, which is unsupported by the record, does not create a genuine issue of material fact.[73]

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that: (1) Mr. Helms's Motion for Leave to Supplement Oral Argument at Docket 64 is **GRANTED;** and (2) the United States' Motion for Summary Judgment and to Dismiss Plaintiff's Action for Lack of Jurisdiction at Docket 49 is **GRANTED.** All pending Court hearings and deadlines are vacated, and the Clerk of Court is instructed to enter judgment in favor of the United States.

DATED this 6th day of June, 2014.

*/s/ Sharon L. Gleason*
United States District Judge

---

[72] *See Gallant v. United States*, 392 F.Supp.2d 1077, 1080 (D. Alaska 2005) (granting defendant's motion for summary judgment on claim where plaintiff "submitted no expert report and so created no issues of material fact").

[73] *Compare* Docket 64-1 at 2 (Proposed Supp.) (tPA does not provide "100% reversal but could in fact remediate" symptoms) *with* Docket 50-3 at 3, 41:21-42:16 (Wapen Dep.) (tPA can improve or resolve stroke symptoms in 12% of people).